### SMITH v. MUTUAL LIFE INS. CO. OF NEW YORK et al.

(Circuit Court, D. Massachusetts. February 26, 1910.)

#### No. 396.

1. BANKRUPTCY (§ 181*)—TRUSTEES—RECOVERY—CONSIDERATION FOR ANNUITY —FRAUD.

In a suit by a bankrupt's trustee to recover the consideration for an annuity purchased by the bankrupt in fraud of creditors, the payments to begin July 1, 1916, the execution of the insurance company's executory contract did not constitute a payment of value which would prevent a termination of the contract and a recovery of the consideration.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 181.*]

2. BANKRUPTCY (§ 303*) — FRAUDULENT TRANSFERS — ANNUITY — TRACING MONEY.

In a suit by a bankrupt's trustee to recover money paid by the bankrupt to defendant insurance company for an annuity to begin in 1916, purchased in fraud of creditors, the trustee was not bound to trace the premium to the insurance company's present possession.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

Suit by Jeremiah Smith, Jr., as trustee in bankruptcy of one Dunning, to recover assets disposed of in fraud of creditors against the Mutual Life Insurance Company of New York and others. Decree for complainant.

Jeremiah Smith, Jr., and Fish, Richardson, Herrick & Neave, for complainant.

Reginald Foster, William D. Turner, and E. S. Mansfield, for defendants.

LOWELL, C. J. This case was before the court on demurrer, and the demurrer was overruled. The frame of the bill was stated in the report. 158 Fed. 365. Proofs have since been taken, and the case is now before the court on final hearing.

The complainant is bound to prove that the payments by the bankrupt to the insurance company were made in fraud of creditors. The first and largest of these payments was made on January 3, 1901. Less than three weeks afterwards, on January 22d, the bankrupt began to carry out his scheme to defraud F. A. Brooks, a scheme which he pursued with increasing success until Brooks' death September 22, 1902. In December, 1900, Brooks and the bankrupt began the negotiations which resulted in the bankrupt's swindling Brooks out of several hundred thousand dollars. I cannot doubt that the bankrupt's scheme to defraud, though elaborated later in detail, was generally conceived by him before the first payment to the insurance company.

Moreover, it is in evidence that in the latter part of 1900 the bankrupt was "swapping" checks with Charles Brooks, son of F. A. Brooks, above mentioned. These checks of the bankrupt were unpaid. Without other evidence, want of payment would not show fraud, but the bankrupt's conduct in its audacious and extreme dishonesty leaves no doubt in my mind that he had conceived the design of defrauding his creditors before January 3, 1901. I find this as a fact. If he was then intending to defraud his creditors, his removal, not in the course of business, of a considerable sum from his assets which would make provision for himself at a later date, was plainly in pursuance of a scheme to defraud his creditors, and I so find as a fact. If the first payment to the insurance company was fraudulently made, it will not be disputed that this was true of the later payments.

If the payment to the insurance company was made by the bankrupt with intent to defraud his creditors, the opinion heretofore rendered on the demurrer leaves little room for argument at the final hearing. The defendant insurance company now contends, as before, that its execution of the insurance policy was a payment of value for the bankrupt's cash received. This valid executory contract of insurance, binding upon the company, was such giving of value as would prevent the bankrupt from recovering back the premiums, but the law permits creditors to avoid some conveyances which are good as against the bankrupt. As was observed in the former opinion:

"The court has here to decide a case in which the value given for the bankrupt's money was not land or goods, but a valid executory agreement. Does that agreement, binding upon the defendant, constitute value paid by him for the money he has received? Is the agreement the equivalent of a chattel? The law is settled otherwise, if the defendant's part of the contract is wholly executory at the time the action is commenced. This has been held in cases where a note, a mortgage, or other agreement to pay money was given by the purchaser to the insolvent." 158 Fed. 366.

The cases there cited support the proposition thus laid down. See, also, Dillard v. Crocker, Speers, Eq. (S. C.) 20, 27; Kurtz v. Troll, 175 Mo. 506, 511, 75 S. W. 386. The defendant relies upon Pierce v. O'Brien, 189 Mass. 58, 75 N. E. 61. In that case the consideration for the sale of the insolvent property was in part promissory notes signed by the purchaser. The record shows that the greater part of these notes had been negotiated, and the plaintiff, the creditor who attacked the sale, made no offer to return them. Some had been paid before trial. As the jury found that the purchaser acted in good faith, and as he could not be replaced in his original position, the purchase stood. In the case at bar, the complainant will put the defendant in a better position than that enjoyed when the contract of insurance was entered into. I do not find myself disposed to overrule the former decision, and I must hold that the defendant is not protected by giving the policy.

The defendant further contends that the money paid it by the bankrupt cannot be traced to its present possession. This is not necessary. It received the money, and if it has since paid out the money, or even lost it in bad investments or otherwise, the burden of evidence

is upon the company to establish that this is true. In fact, the defendant either has the money at the present time or it has spent the money for its own benefit and has the proceeds. Which of these alternatives best states the truth depends upon the use of words, rather than upon any doubtful facts. The defendant has shown that certain expenses of agents' commissions and cost of administration are chargeable against the sum received from the bankrupt. But at the time the bill was brought the bankrupt's premium had been in the defendant's possession more than five years, and had evidently earned for the defendant more interest than the expenses could have come to. According to the average expectation of life, upon which the business of life insurance is based, the defendant will be benefited pecuniarily by granting the prayer of the complainant's bill. As compared with its assets, its liabilities will be less after it has yielded to the complainant's demand. The question is not how long Dunning will live individually, for individual probabilities are ordinarily disregarded in dealing with the problems of life insurance. The question concerns Dunning's expectation of life, and nothing has been shown to prove that his particular expectation differs from the average. The defendant carries on the litigation for Dunning's benefit, and in order to prevent some part of Dunning's property from passing to his creditors, or else the defendant's contest is merely to prevent an interference with the ordinary course of its business, though the interference will result in its profit. Several ingenious arguments have been offered to show that the insurance company will in some way be damaged by the cancellation of the policy and the return of the premium. But these arguments all fail. As was said in the earlier opinion:

"In order to obtain in 1907 an annuity like that here in question Dunning must have paid a considerably larger premium than that charged him in 1901. This larger premium may be taken to be the present value of the agreement here in controversy."

Here the controversy is not between the complainant and other creditors of an insolvent company, in which case the former must show a specific lien upon some part of the insolvent estate, but concerns only the liability of the insurance company to repay that money for which it gave only an executory agreement since wholly unperformed on its part.

Decree for the complainant, with costs.